**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**EUGENE HAMPTON**                                                                   **PLAINTIFF**

**v.**                                      **Case No.: 4:21-cv-00386**

**WELLS FARGO BANK, N.A. &**
**DEUTSCHE BANK NATIONAL TRUST**
**COMPANY, AS TRUSTEE FOR VENDEE**
**MORTGAGE TRUST 1994-3**                                              **DEFENDANTS**

**ORDER**

        This lawsuit concerns the alleged misconduct of two banks related to Plaintiff's mortgage

and the demolition of Plaintiff's home.[1]  Specifically, Mr. Eugene Hampton brings five state-law

claims against Defendants Wells Fargo and Deutsche Bank: (1) unjust enrichment, (2) negligence,

(3) breach of fiduciary duty, (4) trespass, and (5) violations of the Arkansas Deceptive Trade

Practices Act ("ADTPA").[2]

        This is the second time Mr. Hampton has prosecuted a lawsuit in this District against these

Defendants covering essentially the same factual ground.[3]  In the first lawsuit (let's call it *Hampton*

*I*), Judge Billy Roy Wilson entered two orders that, in combination, dismissed Mr. Hampton's

case.[4]  Based on Judge Wilson's dismissal of the last case, Defendants say the Court should dismiss

the case at bar.  Defendants principally argue that Judge Wilson's rulings in *Hampton I* preclude

Mr. Hampton from taking a second bite at the apple.[5]  Alternatively, Defendants argue that some

of Mr. Hampton's claims are untimely and each of Mr. Hampton's claims fails to state a viable

---

[1]   *See* Compl. (Doc. 2).

[2]   *Id.*

[3]   *See Hampton v. Wells Fargo Bank, N.A.*, No. 4:19-cv-00810-BRW (E.D. Ark.) *(Hampton I)* (Doc. 2).

[4]   *Hampton I* (Docs. 63, 81); *see also Hampton I* (Doc. 86) (Judgment).

[5]   Defs.' Mot. to Dismiss (Doc. 3).

cause of action.[6]  Mr. Hampton disputes all of Defendants' arguments.[7]  For the reasons that follow, Defendants' Motion to Dismiss is GRANTED.  Mr. Hampton's breach-of-fiduciary-duty and negligence claims are barred by the claim preclusion facet of res judicata doctrine.  Mr. Hampton's ADTPA, unjust enrichment, and trespass claims are untimely.

## I.   __Factual Background__[8]

Mr. Hampton's Complaint alleges two courses of conduct by Defendants that overlap in time.  The Court will first set out the facts involving Mr. Hampton's home loan.  The Court will then provide the facts related to the demolition of Mr. Hampton's home.  After all this, the Court will recount the somewhat convoluted procedural history of the related prior lawsuit (*Hampton I*) and the lawsuit presently at bar.

### A.  *Mr. Hampton's Home Loan*

On July 31, 1991, Mr. Hampton purchased property, including a house, in Little Rock, Arkansas.[9]  On the same date, Mr. Hampton executed a Deed of Trust Note for the principal sum of $19,400 in favor of the Department of Veterans Affairs ("VA").[10]  Mr. Hampton, as grantor, also executed a Deed of Trust in favor of the VA.[11]  Mr. Hampton agreed to repay the loan principal

---

[6]   *Id.*

[7]   Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 11) ¶ 3 (Mr. Hampton disputing all grounds Defendants press for dismissal).

[8]   On a motion to dismiss, the Court treats the facts alleged in the Complaint as true and draws all reasonable inferences in Mr. Hampton's favor.  *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).  Accordingly, the "factual background" section is only for purposes of deciding the Motion to Dismiss.

[9]   Compl. (Doc. 2) ¶ 5.

[10]  *Id.* ¶ 6.

[11]  *Id.*; *see also* Ex. A to Compl. (Doc. 2) at 27 (stating that the loan is "secured by a Deed of Trust . . . executed" by Mr. Hampton).  "A deed of trust is a deed conveying title to real property to a trustee as security until the grantor repays a loan."  *Mortg. Elec. Registration Sys., Inc. v. Sw. Homes of Ark.*, 2009 Ark. 152, at 5, 301 S.W.3d 1, 4 (internal quotations omitted).  "Under a deed of trust, the borrower conveys legal title in the property by a deed of trust to the trustee."  *Id.*, 301 S.W.3d at 4.

at an interest rate of 9%.[12]  Mr. Hampton agreed to make monthly payments of $156.10 over the course of thirty years with the last payment being due on August 1, 2021.[13]  Mr. Hampton made his first payment in September 1991.[14]

In 1994, the VA assigned its interest in the Deed of Trust to Bankers Trust Company.[15]  In 1999, Deutsche Bank acquired Bankers Trust Company and thus acquired the interest in the Deed of Trust.[16]  Wells Fargo serviced the loan,[17] meaning that Wells Fargo, on Deutsche Bank's behalf, oversaw the day-to-day operations of Mr. Hampton's loan by sending payment invoices and receiving Mr. Hampton's payments.

Things seemed to go along okay until Mr. Hampton's 2002 divorce left him unable to make timely payments on the loan.[18]  In July 2004, Mr. Hampton filed for bankruptcy.[19]  In August 2004, despite the bankruptcy filing, Wells Fargo (on behalf of Deutsche Bank) had its lawyers commence a nonjudicial foreclosure of Mr. Hampton's property.[20]  On November 2, 2004, Deutsche Bank purchased the property at a foreclosure sale for $27,651.31.[21]  This sale price exceeded (by an unknown amount) the balance that Mr. Hampton owed on the loan.[22]  But Deutsche Bank did not give Mr. Hampton the excess.[23]  Two weeks later, Wells Fargo's lawyers filed a Trustee's Deed

---

[12]  Compl. (Doc. 2) ¶ 7.

[13]  *Id.*

[14]  *Id.*

[15]  *Id.* ¶ 9.

[16]  *Id.* ¶ 10.

[17]  *Id.* ¶ 8.

[18]  *Id.* ¶ 11.

[19]  *Id.* ¶ 12.

[20]  *Id.* ¶ 13.

[21]  *Id.* ¶ 14; *see also* Ex. F to Compl. (Doc. 2) at 37–38.

[22]  Compl. (Doc. 2) ¶ 15.  The Complaint does not state how much Mr. Hampton still owed on the loan.  Nor does it state the difference between the $27,651.31 purchase price and the amount Mr. Hampton still owed on the loan.

[23]  *Id.*

conveying the property from Mr. Hampton to Deutsche Bank in the Pulaski County records.[24]  Mr. Hampton received no notice that the foreclosure sale occurred.[25]  Neither Defendant credited Mr. Hampton's account with the proceeds of the sale.[26]

On November 23, 2004, just a few days after the Trustee's Deed conveyance was filed, Wells Fargo entered an appearance in Mr. Hampton's bankruptcy case.[27]  On December 16, 2004, Wells Fargo filed a proof of claim asserting a secured claim totaling $27,120.79.[28]  On the same day, Wells Fargo filed an amended proof of claim asserting "a secured claim for the principal sum of $16,378.83 plus arrears and other charges and costs totaling $23,120.78."[29]  For each proof of claim, Wells Fargo cited the 1991 Deed of Trust as the document supporting the secured claim.[30] Wells Fargo did not mention the foreclosure on or the sale of the house.

In February 2005, Mr. Hampton filed an Objection to Wells Fargo's secured claims.[31] Recall that, at this point, Mr. Hampton has no idea about the foreclosure or sale, and he is still living in the home.  In the Objection, Mr. Hampton confirmed that "Wells Fargo [has] a secured claim against [Mr. Hampton's] homestead property," but he insisted that the amount owed was less than that claimed by Wells Fargo.[32]  In November 2005, the bankruptcy court entered an

---

[24] *Id.* ¶ 16.

[25] *Id.* ¶ 18.

[26] *Id.* ¶ 19.

[27] *Id.* ¶ 21; *see also* Ex. H to Compl. (Doc. 2) at 40.

[28] Compl. (Doc. 2) ¶ 23.

[29] *Id.* ¶ 24.  Mr. Hampton's Complaint says Wells Fargo filed the amended proof of claim on December 13, 2005. *Id.*  Mr. Hampton cites Exhibit J for support of this assertion.  Exhibit J is an Objection to Wells Fargo's proof of claim.  Ex. J to Compl. (Doc. 2) at 46.  The proofs of claim in the record indicate that they were both completed on December 16, 2004.  *See* Ex H to Compl. (Doc. 2) at 40 (listing the date of the proof of claim as December 16, 2004); Ex. I to Compl. (Doc. 2) at 43 (same).

[30] Compl. (Doc. 2) ¶ 25; Ex. H to Compl. (Doc. 2) at 42; Ex. I to Compl. (Doc. 2) at 45.

[31] Compl. (Doc. 2) ¶ 28.  Mr. Hampton's Complaint says he objected to the amount Deutsche Bank claimed, but the documentation Mr. Hampton provided shows that he was objecting to Wells Fargo's claim.  Ex. J. to Compl. (Doc. 2) at 46.

[32] Ex. J. to Compl. (Doc. 2) at 46.

agreed-upon order establishing that the total amount of the "mortgage debt, including the amount of the principal, all pre-petition arrears, attorney fees, and costs was $20,601.53."[33]

Mr. Hampton's bankruptcy lasted forty-seven months.[34]  During that time, Mr. Hampton paid $15,716.99 on the secured claim.[35]  That amount "included the payment of taxes and insurance for the sole benefit of Deutsche Bank."[36]  On June 18, 2008, the bankruptcy court entered an order reflecting the total amount Mr. Hampton paid and releasing Wells Fargo's claim "with future payments to be made directly by [Mr. Hampton] beginning [on August 1, 2008] . . . ."[37]  At this point, Mr. Hampton owed $4,884.64 on the secured claim.[38]  Mr. Hampton began making direct payments to Wells Fargo in August 2008.[39]

In September 2008, Mr. Hampton moved out of the house and allowed his adult children to remain there.[40]  Mr. Hampton left all his personal possessions in the house, including his "keepsake[s] and family memories . . . ."[41]  Mr. Hampton continued to make payments on the loan secured by the Deed of Trust.[42]  In February 2010, "the Deed of Trust Note was satisfied, and Mr. Hampton was no longer obligated on this debt."[43]  Nevertheless, Wells Fargo continued to demand monthly payments from Mr. Hampton, "allegedly for the payment of the mortgage debt secured by the Real Property and payment of taxes and insurance through an escrow that could only be for

---

[33] Ex. K to Compl. (Doc. 2) at 48; Compl. (Doc. 2) ¶ 30.

[34] Compl. (Doc. 2) ¶ 31.

[35] *Id.* ¶ 32.

[36] *Id.* ¶ 33.

[37] *Id.* ¶ 34; Ex. N to Compl. (Doc. 2) at 52.

[38] Compl. (Doc. 2) ¶ 34.

[39] *Id.* ¶ 35.

[40] *Id.* ¶ 36.

[41] *Id.*

[42] *Id.* ¶ 37.

[43] *Id.*

the benefit of Deutsche Bank."[44]  Wells Fargo continued to make the monthly payment demands because Wells Fargo had not properly credited Mr. Hampton's account with the payments Mr. Hampton made during bankruptcy.[45]

Mr. Hampton, still not knowing that Deutsche Bank foreclosed on and apparently now owned the house, complied with Wells Fargo's demands.[46]  He continued to make payments to Wells Fargo until October 2017.[47]  At that time, "Mr. Hampton questioned whether he was paying more than what he was supposed to pay."[48]  Mr. Hampton thus requested an accounting of his loan balance.[49]

On October 6, 2017, Mr. Hampton received a partial accounting from Wells Fargo.[50]  He could not determine from this accounting "if or when his payments were applied and whether they were applied correctly."[51]  The accounting did not show how the payments Mr. Hampton made during bankruptcy were applied to his loan.[52]  On January 25, 2018, Mr. Hampton's counsel sent a letter to Wells Fargo that requested a complete accounting from August 2008 to the present.[53]  Wells Fargo responded on June 8, 2018.[54]  "Wells Fargo's counsel stated in an email that Mr. Hampton [was] entitled to a refund amount of $14,289.13."[55]  The email attached a detailed

---

[44] *Id.* ¶ 39.

[45] *Id.*

[46] *Id.* ¶ 41.

[47] *Id.* ¶ 49.

[48] *Id.* ¶ 50.

[49] *Id.*

[50] *Id.* ¶ 52.

[51] *Id.* ¶ 53.

[52] *Id.*

[53] *Id.* ¶ 57.

[54] *Id.* ¶ 61.

[55] *Id.*; *see also* Ex. U to Compl. (Doc. 2) at 96 (stating that "the refund amount being offered is $14,289.13 so please review with your client accordingly").

spreadsheet showing Mr. Hampton paid Wells Fargo a total of "30,166.29 in post-discharge payments."[56]   Despite offering Mr. Hampton a refund, Wells Fargo continued to send Mr. Hampton payment demands.[57]   Wells Fargo also sent "Mr. Hampton dunning correspondence with threats of a foreclosure on the Real Property."[58]   It seems that even at this late date, Mr. Hampton did not know that the foreclosure had occurred and that Deutsche Bank was the record owner of the property.

### B.   *The Demolition of Mr. Hampton's Home*

In 2015, the City of Little Rock, Department of Housing and Neighborhood Programs "began notifying Deutsche Bank of municipal code violations on" the property at issue in this case.[59]   On April 17, the City sent notice to Deutsche Bank that the property "was inspected and . . . contained defects that made the home unsafe."[60]   The notice said that the house "has been declared by the City to be a nuisance and detrimental to the public welfare of the citizens of the City of Little Rock."[61]   The notice also said that Deutsche Bank had fifteen days "in which to begin substantial repairs or to demolish the structure."[62]   Failure to do so, the City said, would result in legal proceedings against Deutsche Bank and the property to abate the nuisance.[63]   The City left a

---

[56]   Compl. (Doc. 2) ¶ 61.

[57]   *Id.* ¶ 62.

[58]   *Id.* ¶ 68.

[59]   *Id.* ¶ 42.

[60]   *Id.*; *see also* Ex. P to Compl. (Doc. 2) at 75 (notice stating that information obtained by the City "indicate[d] that [Deutsche Bank] [was] the owner/agent" of the property and that Deutsche Bank had fifteen days to begin "substantial repairs").

[61]   Ex. P to Compl. (Doc. 2) at 75.

[62]   *Id.*

[63]   *Id.*

copy of this notice at the house.[64]  Mr. Hampton's children found the notice and told Mr. Hampton

about it.[65]  Here's the notice in relevant part:

**Warning Notice**

April 17, 2015

Deutsche Bank Natl Trust Co[.]
3476 Stateview Blvd
Fort Mill[,] SC 29715

Re:      6601 Wakefield Dr., Parcel ID 3413980000700, CT 20.02, WD 2,
         Valuation: $30,000 Date Inspected: 4/17/15, Legal: Wakefield Village
         Block 0 Lot 7[]

Dear Deutsche Bank Natl Trust Co[.]:

Information obtained by our office indicates that you are the current owner/agent
of the above referenced property.  This notice will advise you that City staff made
an inspection of the structure on the above property.  The inspection revealed that
the structure is unsafe, unfit for human habitation, offensive to the neighborhood,
and it is dangerous to persons in the vicinity or lawfully passing by the structure.
It is hereby declared to be in violation of City ordinances.  Pursuant to the authority
granted by Ark. Code Ann. SS 14-56-203 (West 2004), and Little Rock Ark. Rev.
Code SS 20-28 (1988) the structure has been declared by the City to be a nuisance
and detrimental to the public welfare of the citizens of the City of Little Rock.

Therefore, you have fifteen (15) days in which to begin substantial repairs or to
demolish the structure.  If you fail to comply with this directive, the City will initiate
legal proceedings against you and the property to abate the nuisance.

You are required to secure this dwelling and/or structure in an approved manner
within seven (7) days.  Failure to secure all accessible windows, doors, and/or
openings within the allotted time may result in the City taking appropriate action to
have this accomplished and the owner will be responsible for all incurred costs.
The owner is responsible for maintaining the security of this dwelling and/or
structure until all code requirements have been met by either full rehabilitation, as
specified by the Little [R]ock Housing Code, or demolition.
Please be advised that neither issuance of a permit for repairs or demolition of this
structure nor an extension of time granted by the Department of Housing and
Neighborhood Programs, relieves the owner of the responsibility to secure the
structure.

---

[64]  Compl. (Doc. 2) ¶ 44.

[65]  *Id.*

. . .
Sincerely,
[Signature]
Leroy Jones Code Enforcement Officer.[66]

Mr. Hampton immediately contacted the City "to determine what the problem was, and he was only informed that the foundation of the Home was cracked and needed repair."[67]   Mr. Hampton tried to refinance the property or to receive a home improvement loan to fund the needed repairs.[68]   Wells Fargo and another bank turned Mr. Hampton down.[69]   Unable to get a loan, Mr. Hampton got an estimate for the needed repairs and learned the repairs would cost over $10,000.[70] While trying to save that amount, Mr. Hampton boarded up the house and visited the home bi-monthly to check on it.[71]   Mr. Hampton also paid to maintain the yard.[72]

In 2016 and 2017, Wells Fargo and Deutsche Bank "received notices from [the City], indicating that Deutsche Bank was the owner of the property, and permitted [the City] to believe that."[73]   Wells Fargo and Deutsche Bank did nothing to dispute the City's belief or to change the real estate records.[74]   And while they passed along some of the notices to Mr. Hampton, Wells Fargo and Deutsche Bank "withheld the vital notices that would have told Mr. Hampton that [the City] had begun legal proceedings in late 2017."[75]   During this timeframe, the City told Wells Fargo and Deutsche Bank "it was about to demolish" the home, and Wells Fargo and Deutsche

---

[66]   Ex. P to Compl. (Doc. 2) at 75.

[67]   Compl (Doc. 2) ¶ 44.

[68]   *Id.*

[69]   *Id.* ¶¶ 45–46.

[70]   *Id.* ¶ 47.

[71]   *Id.*

[72]   *Id.*

[73]   *Id.* ¶ 54.

[74]   *Id.*

[75]   *Id.*

Bank did not tell Mr. Hampton.[76]  In late 2017 and early 2018, Wells Fargo and Deutsche Bank communicated with the City to aid in demolishing Mr. Hampton's home.[77]  Specifically, Wells Fargo and Deutsche Bank represented that they "had the right to receive notices, had authority to consent to a demolition, and that demolition was an acceptable option for them."[78]  In January 2018, agents from Wells Fargo and Deutsche Bank entered Mr. Hampton's home unannounced and without his consent to further assist the City with its demolition efforts.[79]

On March 2, 2018, Mr. Hampton's home "and all of its contents were demolished at Wells Fargo's direction."[80]  Because Mr. Hampton did not receive any notices from the City, he was unaware of the impending demolition and only learned of it when he found an empty lot while conducting one of his regular trips to check on the house.[81]

There's one final twist to this plotline.  It appears that in March 2019—after Mr. Hampton filed *Hampton I*—Wells Fargo's lawyers (on behalf of Wells Fargo and Deutsche Bank) filed documents affecting the title to the property at issue.[82]  Specifically, Wells Fargo's lawyers filed an "Affidavit to Clarify Title."[83]  The Affidavit asserted that the title to Mr. Hampton's property "should be clarified because the Foreclosure Sale occurring more than 14 years ago was a nullity."[84]  The Affidavit shows that Deutsche Bank, as grantor, conveyed the property to Mr. Hampton, as grantee.[85]  Wells Fargo and Deutsche Bank appeared not to have told Mr. Hampton

---

[76]  *Id.*

[77]  *Id.* ¶ 55.

[78]  *Id.*

[79]  *Id.* ¶ 56.

[80]  *Id.* ¶ 58.

[81]  *Id.* ¶ 59.

[82]  *Id.*

[83]  *Id.*

[84]  *Id.*; *see also* Ex. Y to Compl. (Doc. 2) at 131.

[85]  Ex. Y to Compl. (Doc. 2) at 131.

about this conveyance.  Mr. Hampton only learned about it later, in May 2019, when the City

began addressing notices to him regarding the condition of the property.[86]

### C.  *Procedural History of Hampton I*

On March 5, 2019, Mr. Hampton sued Wells Fargo in state court for conversion and unjust

enrichment.[87]  So begins *Hampton I*.  Mr. Hampton alleged a lot of facts about Wells Fargo's

involvement in Mr. Hampton's bankruptcy case.[88]  Specifically, the complaint alleged that Mr.

Hampton  and  Wells  Fargo  entered  into  an  agreed-upon  order  establishing  Wells  Fargo's

entitlement to a secured claim of $20,601.53.[89]  The complaint alleged that Mr. Hampton paid

$15,716.99 on this claim over the life of the bankruptcy plan.[90]  The complaint noted that the

bankruptcy court released the claim on June 18, 2008, directing Mr. Hampton to begin making

payments to Wells Fargo.[91]  Mr. Hampton alleged that he made such payments and satisfied the

balance  of  the  claim  in  February  2010.[92]  Nevertheless,  Wells  Fargo  continued  to  demand

payments from Mr. Hampton, which he made because he feared foreclosure.[93]

In October 2017, the complaint alleged, Mr. Hampton received an accounting from Wells

Fargo showing he had paid $16,375 in post-discharge payments, "which [was] significantly higher

than the $4,884.54 that [Mr. Hampton] was ordered to pay post-discharge."[94]  In January 2018,

Mr. Hampton's counsel requested a complete accounting covering August 2008 through January

---

[86] Compl. (Doc. 2) ¶ 64.

[87] *Hampton I*, 4:19-cv-810-BRW (Doc. 2) at 4–5.  Mr. Hampton's original complaint listed a request for an injunction and punitive damages as additional counts.  *Id.* at 6–7.

[88] *Id.* at 2–4.

[89] *Id.* at 2.

[90] *Id.* at 3.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* at 4.

2018.[95]  Wells Fargo's attorney provided this accounting and stated that Mr. Hampton was "entitled to a refund amount of $14,289.13."[96]  Mr. Hampton countered with a claim in excess of the proposed refund amount.[97]  Wells Fargo then changed lawyers and took the position that Mr. Hampton, "in fact, owe[d] [Wells Fargo] more money."[98]  Wells Fargo also indicated to Mr. Hampton that it had referred Mr. Hampton's account to its foreclosure unit.[99]

It is interesting to note the absence of any allegations regarding the 2004 nonjudicial foreclosure and sale of Mr. Hampton's home.  It appears that Mr. Hampton did not yet know of the foreclosure or sale to Deutsche Bank.  Then, on October 30, 2019, Mr. Hampton filed an amended complaint.[100]  Mr. Hampton added Deutsche Bank as a defendant.[101]  Mr. Hampton added a claim for fraud, a claim under the Arkansas Deceptive Trade Practices Act ("ADTPA"), and a claim under the Arkansas Fair Debt Collection Practices Act ("AFDCPA").[102]  The ADTPA allows a person to sue a business for, *inter alia*, "unconscionable, false, or deceptive" business practices.[103]  The AFDCPA "imposes civil liability on debt collectors for certain prohibited debt-collection practices."[104]

The factual allegations in the amended complaint largely mirrored those of the original complaint.  However, Mr. Hampton did add allegations related to the nonjudicial foreclosure that

---

[95]  *Id.*

[96]  *Id.*

[97]  *Id.*

[98]  *Id.*

[99]  *Id.*

[100]  *Hampton I* (Doc. 4).

[101]  *Id.*

[102]  *Id.* at 10, 12–15.

[103]  *See* Ark. Code Ann. § 4-88-107(a)(10) (listing unconscionable business practices as one type of violation of the ADTPA; *id.* § 4-88-113(f)(1)(A) (giving a person a cause of action under the ADTPA).

[104]  *McMullen v. McHughes Law Firm*, 2015 Ark. 15, at 8, 454 S.W.3d 200, 205.

occurred in November 2004 (discussed above).[105]  He must have learned of the 2004 nonjudicial foreclosure sometime between filing the original complaint and the first amended complaint.

On November 19, 2019, Wells Fargo and Deutsche Bank removed the case to the United States District Court for the Eastern District of Arkansas.[106]  Judge Billy Roy Wilson presided over the case in federal court.[107]  In September 2020, Mr. Hampton filed a second amended complaint.[108]  The second amended complaint added yet another claim, this one under the Real Estate Settlement and Procedures Act ("RESPA").[109]  The Supreme Court says that RESPA "regulates the market for real estate 'settlement services' . . . ."[110]  Part of RESPA sets out how a mortgage servicer must respond to borrower inquiries.[111]  Under the RESPA claim, Mr. Hampton referenced the March 2018 demolition of the home.[112]  Specifically, Mr. Hampton alleged that "Defendants['] failure to respond properly directly resulted in the home being demolished . . . ."[113]

Defendants filed a Motion to Dismiss the second amended complaint.[114]  Judge Wilson granted the motion in part and denied it in part.[115]  First and foremost, Judge Wilson explained that "the law is clear: the foreclosure sale was *void ab initio*, and had no legal effect."[116]  To Judge

---

[105] *Hampton I* (Doc. 4) at 3–4.

[106] *Hampton I* (Doc. 1).

[107] *Id.*  Normally, the case at bar would go back to Judge Wilson.  However, one of the lawyers in the case at bar is on Judge Wilson's recusal list.  So random draw of a judge, like what occurred here, is the appropriate result.

[108] *Hampton I* (Doc. 37).  The facts section of the second amended complaint was unchanged from the parallel section in the first amended complaint.  *Compare Hampton I* (Doc. 4) ¶¶ 1–74, *with Hampton I* (Doc. 37) ¶¶ 1–74.

[109] *Id.* (Doc. 37) at 15.

[110] *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 626 (2012).

[111] *See* 12 U.S.C. § 2605(e).

[112] *Hampton I* (Doc. 37) at 20.

[113] *Id.* at 22.

[114] *Hampton I* (Doc. 42).

[115] *Hampton I* (Doc. 63).

[116] *Id.* at 5.  Judge Wilson dismissed Mr. Hampton's claim for punitive damages, stating that "punitive damages are grounds for relief, not a separate cause of action."  *Id.* at 6.

Wilson, this meant that Mr. Hampton maintained ownership of the property and remained liable "under the mortgage" after the foreclosure sale.[117]  It also had some negative consequences for Mr. Hampton's claims.

Judge Wilson dismissed Mr. Hampton's claims for conversion, fraud, and for violations of the AFDCPA.[118]  With respect to the conversion claim, Judge Wilson ruled that it was fatally flawed because it was premised on Defendants' failure to give Mr. Hampton the proceeds of the void foreclosure sale.[119]  With respect to fraud, Judge Wilson said this claim was predicated on Defendants' alleged false representations that Mr. Hampton was the owner of the property at issue.[120]  Based on Judge Wilson's *void-ab-initio* ruling, Mr. Hampton was the owner of the property, and thus Mr. Hampton's fraud claim failed.[121]  And with respect to the AFDCPA, Judge Wilson ruled that (1) Defendants' demand for payment was valid because the 2004 foreclosure sale was *void ab initio*, and (2) the AFDCPA did not apply to Defendants because "[n]either Defendant [was] a 'debt collector' under the AFDCPA."[122]

Judge Wilson found the other claims in the case lacking, but Mr. Hampton was allowed the opportunity to try to amend them.[123]  With respect to unjust enrichment, Judge Wilson ruled that (1) this claim failed to the extent it was premised on the idea that Mr. Hampton's mortgage debt was fully satisfied with the foreclosure sale and (2) Mr. Hampton could amend his complaint to the extent this claim was based on payments Mr. Hampton made after he allegedly satisfied the

---

[117] *Id.* at 5.

[118] *Id.* at 10.

[119] *Id.* at 5.

[120] *Id.* at 6.

[121] *Id.*

[122] *Id.* at 7.

[123] *Id.* at 10.

mortgage debt in 2010.[124]  With respect to Mr. Hampton's claim under the ADTPA, Judge Wilson ruled that (1) this claim failed to the extent it was based on Defendants' collection of a debt discharged in bankruptcy and (2) Mr. Hampton "has not sufficiently pled what actions [Defendants] took that were unconscionable, false, or deceptive other than sending a bill on a mortgage that Defendant[s] believed (based on documents provided by Plaintiff) did not mature until 2021."[125]  Judge Wilson granted Mr. Hampton leave to clear up his allegations related to ADTPA violations.[126]  Finally, Judge Wilson was dubious of Mr. Hampton's assertions that RESPA violations caused the demolition of Mr. Hampton's home but nonetheless granted Mr. Hampton leave to amend his RESPA claim.[127]

In summary, Judge Wilson dismissed Mr. Hampton's claims for conversion, fraud, and violations of the AFDCPA.[128]  And Judge Wilson gave Mr. Hampton the opportunity to "file an amended complaint clearing up the allegations related to his claims respecting unjust enrichment, the ADTPA, and RESPA."[129]

Mr. Hampton filed a third amended complaint.[130]  Pursuant to Judge Wilson's October 10, 2020 Dismissal Order, Mr. Hampton narrowed his claims to unjust enrichment and violations of the ADTPA and RESPA.[131]  Mr. Hampton added to his factual allegations by quoting language from the Deed of Trust and emphasizing that Mr. Hampton did not have notice of the 2004

---

[124] *Id.* at 5–6.

[125] *Id.* at 7.

[126] *Id.* at 10.

[127] *Id.* at 8–10.

[128] *Id.* at 10.

[129] *Id.*

[130] *Id.* (Doc. 65).

[131] *Id.* at 16, 18, 26.

foreclosure sale.[132]  Mr. Hampton also alleged that Wells Fargo failed to credit his account with the amount Deutsche Bank allegedly paid to purchase Mr. Hampton's home at foreclosure.[133]  The largest addition to Mr. Hampton's fact section involved allegations concerning the City's notices about the condition of the house and the ultimate demolition of the house.[134]  Many of the allegations in the third amended complaint in *Hampton I* appear in the Complaint in the case at bar.[135]

In the unjust enrichment section of the third amended complaint, Mr. Hampton pressed the issue that Wells Fargo failed to properly credit Mr. Hampton with monies from the 2004 foreclosure sale.[136]  Mr. Hampton also said that if the 2004 foreclosure sale was a nullity, Mr. Hampton is still "entitled to the time value of these funds for 14 years."[137]  Mr. Hampton claimed the money he paid to Wells Fargo during the bankruptcy went to taxes and insurance on a home that solely benefited Deutsche Bank.[138]  Mr. Hampton said that the $30,166.29 he paid after his bankruptcy flowed from a "snowball effect" begun by Wells Fargo charging interest on an inaccurate principal amount.[139]  Additionally, Mr. Hampton alleged that Deutsche Bank deprived him of his "beneficial interest in the Real Property as homeowner," which included "interest payment deductions under the Federal Tax Code . . . ."[140]  Instead, Deutsche Bank "was entitled to this deduction for 14 years and retained this benefit . . . ."[141]

---

[132] *Id.* at 6.

[133] *Id.*

[134] *Id.* at 10–11, 13.

[135] *Compare* Compl. (Doc. 2) ¶¶ 42–48, 50, 58–59, *with Hampton I* (Doc. 65) ¶¶ 43–49, 51, 56–57.

[136] *Hampton I* (Doc. 65) at 16.

[137] *Id.*

[138] *Id.*

[139] *Id.* at 17.

[140] *Id.*

[141] *Id.*

In the ADTPA section of the third amended complaint, Mr. Hampton extensively discussed Defendants' conduct during the bankruptcy.[142]   Mr. Hampton also alleged that Wells Fargo "willfully, falsely and inaccurately appl[ied] payments made after Mr. Hampton's bankruptcy to his mortgage accounts creating false principal balances every month as a matter of policy and practice."[143]   Mr. Hampton said that Wells Fargo covered up this practice and failed to provide requested information that would have revealed Wells Fargo's "ongoing practices of maintaining inaccurate mortgage accounts."[144]   Mr. Hampton went on to say that Defendants continue to violate the ADTPA by "sending notices in an attempt to collect a debt that Defendant[s] have actual knowledge that Mr. Hampton does not owe and have admitted Mr. Hampton does not owe."[145]

For his RESPA claim, Mr. Hampton primarily cited statutory and regulatory provisions related to RESPA.[146]   Mr. Hampton alleged that he made an inquiry to Wells Fargo under RESPA in January 2017.[147]   He said that Wells Fargo violated RESPA by seeking excessive extensions of time to respond, and then going "radio silent."[148]   Mr. Hampton continued making payments during this time.[149]   Mr. Hampton said Wells Fargo should have discovered Mr. Hampton's overpayment and refunded him.[150]   Then, the reasoning goes, Mr. Hampton could have regained ownership of

---

[142] *Id.* at 26–28.

[143] *Id.* at 27.

[144] *Id.*

[145] *Id.*

[146] *Id.* at 18–23.

[147] *Id.* at 20.

[148] *Id.* at 21.

[149] *Id.*

[150] *Id.*

the home and been able to address the code violations.[151]  Mr. Hampton also said that the response he finally received on October 6, 2017 (the partial accounting), was "woefully inadequate."[152]

Mr. Hampton said basically the same thing happened in 2018.[153]  Mr. Hampton sent a Qualified Written Request on January 25, 2018.[154]  "But there is no record that Wells Fargo sent an acknowledgment" of this request.[155]  "If Deutsche Bank or Wells Fargo had told Mr. Hampton he had overpaid and title was not in his name . . ., he would have found out about the demolition notices and been able to save his home."[156]

Defendants filed a Motion to Dismiss the third amended complaint.[157]  Judge Wilson granted the Motion.[158]  Judge Wilson reiterated his previous principal finding: The foreclosure sale was *void ab initio*.[159]  As a result, Mr. Hampton's unjust enrichment claim again failed to the extent it depended on the foreclosure sale.[160]  Judge Wilson went on to describe as conclusory Mr. Hampton's assertions that Defendants' failure to properly apply bankruptcy payments led to Mr. Hampton owing more interest than he otherwise would have.[161]  Judge Wilson noted that he "directed Plaintiff to clear up his allegations," and concluded that the third amended complaint did not do so.[162]  Judge Wilson dismissed Mr. Hampton's unjust enrichment claim.[163]

---

[151] *Id.*

[152] *Id.* at 22.

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Hampton I* (Doc. 69) at 1.

[158] *Hampton I* (Doc. 81) at 1.

[159] *Id.* at 5.

[160] *Id.* at 5–6.

[161] *Id.* at 6.

[162] *Id.*

[163] *Id.* at 9.

Judge Wilson also dismissed Mr. Hampton's RESPA claim, concluding that Defendants' alleged failures to provide required appropriate information in an appropriate RESPA response was unrelated to the City's later demolition of the house.[164]  Judge Wilson further said that "[e]ven if Defendants directed [the City] to tear down the home . . ., the actions do not support a claim under RESPA."[165]

Regarding Mr. Hampton's ADTPA claim, Judge Wilson again concluded that this claim was inextricably tied to the void 2004 foreclosure and therefore "without merit."[166]  Judge Wilson also found that Mr. Hampton's third amended complaint included a "hodgepodge of conclusory allegations in an effort to make a claim under the ADTPA."[167]   Judge Wilson ruled that Mr. Hampton did not meet his pleading burden on this claim.[168]

In the same Order, Judge Wilson addressed Mr. Hampton's then-pending Motion for Leave to Amend.[169]  Judge Wilson noted that Mr. Hampton wanted to file another complaint—this would have been the fifth complaint in the case—to add claims for negligence, breach of fiduciary duty, and trespass.[170]  Judge Wilson concluded, "to a legal certainty," that Mr. Hampton's new claims, "could not satisfy the amount-in-controversy requirement."[171]   Judge Wilson explained that the absence of diversity jurisdiction meant no reason existed for Mr. Hampton to amend his case.[172]

---

[164] *Id.* at 8.

[165] *Id.*

[166] *Id.* at 9.

[167] *Id.*

[168] *Id.*  Judge Wilson noted that, "to the extent that some claim might be parsed out of the allegations," he would decline jurisdiction.  *Id.*

[169] *Id.*; *see also Hampton I* (Doc. 75) (Plaintiff's Motion to Amend).

[170] *Hampton I* (Doc. 81) at 9.

[171] *Id.*

[172] *Id.*  In the third amended complaint, there had been a federal claim: the alleged RESPA violation.  Now that this dual claim was dismissed, the new claims would need to fall within the Court's diversity jurisdiction to go forward.

Before Judgment was entered, Mr. Hampton filed a Motion to Clarify, asking Judge Wilson "for an order making it clear that a dismissal of the unjust enrichment claim is without prejudice."[173]  Judge Wilson obliged and stated that Mr. Hampton's claims for unjust enrichment and violations of the ADTPA were dismissed without prejudice.[174]  With respect to Mr. Hampton's RESPA claim, Judge Wilson said that "it is impossible for Plaintiff to establish a RESPA claim under the facts of this case" and that the RESPA claim was dismissed with prejudice.[175]

### D.  *Procedural History of the Case at Bar*

On February 26, 2021, about a month after Judge Wilson entered Judgment in *Hampton I*, Mr. Hampton filed the instant lawsuit in state court.[176]  As mentioned, Mr. Hampton sued Wells Fargo and Deutsche bank for violations of the ADTPA, unjust enrichment, negligence, breach of fiduciary duty, and trespass.[177]  On May 11, 2021, Defendants removed the case to this District based on diversity-of-citizenship jurisdiction.[178]  About a week later, Defendants filed the pending Motion to Dismiss.[179]

In the Motion, Defendants argue that all of Mr. Hampton's claims are precluded by either issue preclusion (Mr. Hampton's ADTPA and unjust enrichment claims) or claim preclusion (Mr. Hampton's negligence, breach-of-fiduciary-duty, and trespass claims).[180]  Defendants also argue that Mr. Hampton's claims fail to state viable causes of action.[181]  Finally, Defendants argue that

---

[173] *Hampton I* (Doc. 82-1) at 3.

[174] *Hampton I* (Doc. 85) at 1.

[175] *Id.*

[176] Compl. (Doc. 2).

[177] *Id.* ¶¶ 69, 79, 103, 108, 113.

[178] Notice of Removal (Doc. 1) at 1–2.

[179] Defs.' Mot. to Dismiss (Doc. 3).

[180] *Id.* at 2.

[181] *Id.*

Mr. Hampton's unjust enrichment, ADTPA, and trespass claims are barred by the applicable statutes of limitations.[182]  Mr. Hampton disputes all of these points.[183]

## II.    Discussion

Mr. Hampton's claims must be dismissed.  Some are barred by the applicable statutes of limitations.  The others are barred by *res judicata* (claim preclusion).

### A.  Mr. Hampton's unjust enrichment, ADTPA, and trespass claims are time-barred.

In a diversity suit, this Court applies "federal pleading standards . . . to the state substantive law to determine if a complaint makes out a claim under state law."[184]  Statute of limitations issues are considered substantive, and so this Court will "apply the law of Arkansas, the forum state, to determine statute-of-limitations issues."[185]  Both sides agree Arkansas law governs the applicable limitations periods.[186]

It is true, of course, that a court must resolve 12(b)(6) dismissal motions based solely on the complaint.[187]  But that does not always preclude a 12(b)(6) dismissal on time-bar grounds. Indeed, the Eighth Circuit "recognize[s] that when it 'appears from the face of the complaint itself that the limitation period has run,' a limitations defense may properly be asserted through a Rule

---

[182] *Id.*

[183] *See* Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 11) (denying all grounds upon which Defendants' Motion to Dismiss is based).

[184] *Karnatcheva v. JPMorgan Chase Bank, N.A.*, 704 F.3d 545, 548 (8th Cir. 2013).

[185] *Highland Indus. Park, Inc. v. BEI Def. Sys. Co.*, 357 F.3d 794, 796 (8th Cir. 2004).

[186] *See, e.g.*, Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 4) at 16 (applying Arkansas law to argue that Mr. Hampton's unjust enrichment claim is time-barred); Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 2 (listing applicable statutes of limitations based on Arkansas law).

[187] A complaint is subject to 12(b)(6) dismissal only when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed R. Civ. P. 12(b)(6).  To survive dismissal, then, a complaint must simply contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Factual allegations are taken to be true at the motion-to-dismiss stage because the plaintiff has not had a full opportunity to conduct discovery and thereby uncover facts that support his or her claim."  *Ashley v. U.S. Dep't of Interior*, 408 F.3d 997, 1000 (8th Cir. 2005).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

12(b)(6) motion to dismiss."[188]  If it is clear from the face of the complaint that an action is "barred by the applicable limitations period, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the statute of limitations was in fact tolled."[189]

Defendants argue that Mr. Hampton's claims for unjust enrichment, trespass, and violations of the ADTPA are time-barred.[190]  For the reasons explained below, the Court agrees.

### 1. Unjust Enrichment

The Eighth Circuit has held that unjust enrichment claims are subject to a three-year statute of limitations under Arkansas law.[191]  And Arkansas caselaw is clear that "[t]he limitations period commences upon occurrence of the wrongful act."[192]  Specifically, the Arkansas Supreme Court says that the period "begins to run when there is a complete and full cause of action, and in the absence of concealment or wrong, when the injury occurs, not when it is discovered."[193]  Importantly, the Eighth Circuit has noted that "Arkansas has repeatedly and consistently rejected any continuing-tort theory . . . ."[194]  In other words, the Arkansas Supreme Court has held tight to the occurrence rule.

---

[188] *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (quoting *Wycoffe v. Menke*, 773 F.2d 983, 984–85 (8th Cir. 1985)).

[189] *Id.*; *see also Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401, 409 (8th Cir. 2017) (stating that a plaintiff "bears the burden of establishing the applicability of" tolling theories).

[190] Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 4) at 16, 19, 24.

[191] *Graham*, 940 F.3d at 408.

[192] *Id.*

[193] *Quality Optical of Jonesboro, Inc. v. Trusty Optical, LLC*, 365 Ark. 106, 110, 225 S.W.3d 369, 372 (2006) (internal citation omitted).

[194] *Graham*, 940 F.3d at 409; *see also Trusty Optical*, 365 Ark. at 110, 225 S.W.3d at 372 ("As we have repeatedly stated, this court does not recognize a 'continuing tort' theory."); *Chalmers v. Toyota Motor Sales, USA, Inc.*, 326 Ark. 895, 906, 935 S.W.2d 258, 264 (1996) ("[W]e have specifically rejected the continuing-tort theory of tolling the statute of limitations as inconsistent with the General Assembly's intent in stating that limitations begin to run at the date of the wrongful act complained of and no other time.") (citation and internal quotation marks omitted).

Under Arkansas caselaw, "[t]o find unjust enrichment, a party must have received something of value, to which he or she is not entitled and which he or she must restore."[195]  As in *Hampton I*, Mr. Hampton's instant Complaint presents two major theories of unjust enrichment. The first theory relies on the 2004 foreclosure sale.[196]  Mr. Hampton argues that "Deutsche Bank failed to remit to Mr. Hampton the surplus proceeds."[197]  He also says Deutsche Bank benefited from Mr. Hampton's payment of taxes and insurance on the foreclosed property during the life of Mr. Hampton's bankruptcy.[198]  This conduct occurred well outside the limitations period. According to the Complaint, the foreclosure sale happened on November 2, 2004.[199]  And Wells Fargo's secured claim was released from the bankruptcy plan on June 18, 2008.[200]  Even if the Court uses this later date for the commencement of the limitations period, any claim for unjust enrichment factually dependent on the foreclosure and bankruptcy proceedings must have been brought before June 18, 2011.[201]

For his second theory, Mr. Hampton says that "the doctrine of unjust enrichment requires Wells Fargo to return . . . all sums of money received after the satisfaction of the Deed of Trust Note in 2010."[202]  (Recall that Mr. Hampton says that he paid off the Deed of Trust Note in February 2010.[203])  Mr. Hampton contends that Wells Fargo "has continued, every month, to send

---

[195] *Campbell v. Asbury Auto., LLC*, 2011 Ark. 157, at 21, 381 S.W.3d 21, 36.

[196] Compl. (Doc. 2) ¶ 71.

[197] *Id.*

[198] *Id.* ¶ 73.

[199] *Id.* ¶ 14.

[200] Ex. L to Compl. (Doc. 2) at 49.

[201] Mr. Hampton, perhaps wisely, seems to give up the ghost on this unjust-enrichment theory.  In his briefing in response to Defendants' Motion to Dismiss, Mr. Hampton says that he is "not suing for the foreclosure sale or the bankruptcy case."  Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 1.

[202] Compl. (Doc. 2) ¶ 77.

[203] *Id.* ¶ 37.

payment demands to Mr. Hampton in an attempt to collect a debt that Mr. Hampton" doesn't owe.[204]   Mr. Hampton says he made timely monthly payments to Wells Fargo until October 2017.[205]   Taking all that as true, as the Court must, Mr. Hampton made a March 2010 payment to Wells Fargo after he satisfied the debt.   When he made that payment, he had a "complete and full cause of action" for unjust enrichment.[206]   In other words, the limitations period for Mr. Hampton's unjust enrichment claim ran, at the latest, in March 2013.   But he didn't bring suit (*Hampton I*) until six years later—in March 2019.   So, Mr. Hampton's unjust enrichment claim was nearly six years late when he asserted it in *Hampton I*.

Mr. Hampton offers a few arguments in response.   His first argument is that *Hampton I* was timely filed because he made his last payment in October 2017 (less than three years before *Hampton I* was filed).[207]   Mr. Hampton argues that, by operation of the Arkansas savings statute, his unjust enrichment claim in the case at bar is still timely.[208]   The problem with this argument is the fact that *Hampton I* was filed well beyond the statute of limitations.   The Arkansas savings statute applies when a plaintiff suffers a nonsuit of a timely filed action.[209]   If that happens, the plaintiff can "commence a new action within one (1) year after the nonsuit suffered . . . ."[210] Because *Hampton I* was untimely, the savings statute provides no quarter to Mr. Hampton.[211]

---

[204] *Id.* ¶ 40.

[205] *Id.* ¶ 49.

[206] *Trusty Optical*, 365 Ark. at 110, 225 S.W.3d at 372.

[207] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 2–3.

[208] *Id.*

[209] Ark. Code Ann. § 16-56-126(a)(2).

[210] *Id.*

[211] *See Elzea v. Perry*, 340 Ark. 588, 592, 12 S.W.3d 213, 216 (2000) (stating that the savings "statute is only used when the original statute of limitations period expires in the interim between the filing of the complaint and the time at which either a nonsuit is entered or the judgment is reversed or arrested").

Mr. Hampton seems to think that "each overpayment was a new and different injury."[212] From this premise, Mr. Hampton argues that his "payments between March 2016 (3 years before the *Hampton I* was filed) and October 2017 should be recoverable."[213]  Mr. Hampton provides no caselaw to support this argument.  The Court hasn't found any either.  Indeed, the Eighth Circuit's decision applying Arkansas law in *Graham v. Catamaran Health Solutions, LLC* cuts the other way.[214]  There, a plaintiff sued an insurer for unjust enrichment in 2014 based on an allegedly substandard policy that he purchased in 2001 and on which he continued making payments until 2014.[215]  The Eighth Circuit used 2001 (not 2014) as the time when plaintiff's unjust enrichment claim arose.[216]  The Eighth Circuit reasoned that, "[a]lthough [plaintiff] continued paying premiums through 2014, the inapplicability of the continuing-tort theory makes the ongoing nature of his payments and the insurance relationship immaterial."[217]

So too here.  Mr. Hampton clearly alleges that Defendants' post-February 2010 receipt of Mr. Hampton's monthly payments gave rise to an unjust enrichment claim.  Accordingly, that is when the limitations period began to run.  The fact that Defendants continued to receive these payments until October 2017 goes to the amount of Mr. Hampton's damages flowing from Defendants' wrongful act (charging him for a debt he didn't owe), but each month's bill does not give rise to a discrete claim for unjust enrichment.[218]

---

[212] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 3.

[213] *Id.*

[214] 940 F.3d at 408–09.

[215] *Id.* at 405.

[216] *See id.* at 409 (discussing the fact that plaintiff's allegations surrounding "marketing, underwriting, and purchase of his policy occurred in 2001" and stating that plaintiff's continued payments were of no moment).

[217] *Id.*

[218] The best case for Mr. Hampton is *Pennington v. BHP Billiton Petroleum (Fayetteville), LLC.*  In *Pennington* the Arkansas Supreme Court considered the following certified question:

> In the oil and gas leases at issues in this case, does the five-year statute of limitations set forth in Arkansas Code section 16-56-111(a) bar Plaintiffs from bringing a breach of contract lawsuit for

Mr. Hampton also argues that the limitations period on his unjust enrichment claim did not begin until Wells Fargo said he was entitled to a refund on June 8, 2018.[219]  As stated above, "[t]he statutory limitations period begins to run when there is a complete and full cause of action, and in the absence of concealment or wrong, when the injury occurs, not when it is *discovered*."[220]  So, if Mr. Hampton is arguing that his claim did not accrue until he discovered the injury, Arkansas law clearly forecloses that argument.  However, to be safe, the Court construes this argument as raising fraudulent concealment as a reason to toll the limitations period.

The Eighth Circuit, applying Arkansas law, says that "[t]he concealment of a wrong through misrepresentations . . . may toll the limitations period."[221]  But "[c]oncealment of facts, no matter how fraudulent or otherwise wrongful, has no effect on the running of a statute of limitations if the plaintiffs could have discovered the fraud or sufficient other facts on which to

---

alleged underpayments of monthly royalties that occurred within the statute of limitations period because similar underpayments of monthly royalties took place outside of the limitations period?

2021 Ark. 179, at 3, 631 S.W.3d 555, 556–57.  The Arkansas Supreme Court answered in the negative.  *Id.*, 631 S.W.3d at 557.  The court reasoned that the leases at issue required defendants to "remit payment based on gross proceeds, a monthly calculation."  *Id.* at 6, 631 S.W.3d at 558.  Plaintiffs had alleged that defendants improperly made this calculation, which infected the payments they disbursed each month.  *Id.*, 631 S.W.3d at 558.  The court said "[t]he damage element of breach of contract would have been established monthly and, potentially, in a different amount each month."  *Id.*, 631 S.W.3d at 558.  Each underpayment thus constituted a "separate and singular breach[] under Arkansas law."  *Id.*, 631 S.W.3d at 558.

Mr. Hampton's case doesn't fall under this rubric.  Assuming Mr. Hampton paid off the Deed of Trust when he said he did, no contractual obligations remained between Defendants and Mr. Hampton.  From that point on, neither party was contractually bound to the other, and thus the "separate-contract-breach" theory is inapplicable here.  An unjust enrichment claim like Mr. Hampton's is more like a tort claim where repeat damages might flow from a single wrongful event.  Perhaps put a little differently, unlike successive breaches of a contract that are separate and distinct claims in and of themselves, an unjust enrichment claim like Mr. Hampton's accrues once at a single time period, even if the damages from that claim increase over time because of additional unnecessary payments.

[219] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 3.

[220] *Trusty Optical*, 365 Ark. at 110, 225 S.W.3d at 372 (emphasis added).

[221] *Graham*, 940 F.3d at 409.

bring their lawsuit, through a reasonable effort on their part."[222]  Mr. Hampton, "as the plaintiff, bears the burden of establishing the applicability of this tolling theory."[223]

According to Mr. Hampton, he continued paying Wells Fargo after February 2010 because he was threatened with the loss of his property (not because Wells Fargo duped him into believing that he still owed on the property).[224]  Nowhere in the Complaint or in the briefing does Mr. Hampton say that Wells Fargo prevented him from discovering the fact that he had already paid off the debt.[225]  Mr. Hampton does not allege that he requested payment records during the limitations period.  Mr. Hampton does not allege that Defendants engaged in "some positive act of fraud, something so furtively planned and secretly executed as to keep [Mr. Hampton's] cause[s] of action concealed, or perpetrated in a way that conceals itself."[226]  In fact, Wells Fargo sent Mr. Hampton payment demands monthly.  And these demands listed what Wells Fargo represented to be Mr. Hampton's unpaid principal balance each month.[227]  Any reasonable effort on Mr. Hampton's part during the limitations period would have revealed that he did not owe the money Defendants claimed he did.  But Mr. Hampton did not inquire into his payment history with Defendants until October 2017—over seven years after he allegedly paid off the loan.  In short, if Mr. Hampton did pay on a debt he did not owe for as long as he says he did, he certainly alleges

---

[222] *Varner*, 371 F.3d at 1017; *see also Graham*, 940 F.3d at 409.

[223] *Graham*, 940 F.3d at 409.

[224] Compl. (Doc. 2) ¶ 41.

[225] *See Chalmers*, 326 Ark. at 902, 935 S.W.2d at 261–62 ("No mere ignorance on the part of the plaintiff of his rights, nor the mere silence of one who is under no obligation to speak, will prevent the statute bar.  There must be some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed or perpetrated in a way that it conceals itself.  And if the plaintiff, by reasonable diligence, might have detected the fraud he is presumed to have had reasonable knowledge of it.") (internal quotations and citations omitted).

[226] *Delanno, Inc. v. Peace*, 366 Ark. 542, 545, 237 S.W.3d 81, 84 (2006).

[227] *See, e.g.*, Ex. W to Compl. (Doc. 2) at 124.

no facts showing that a reasonable effort on his part would not have uncovered Defendants' alleged perfidy.

Defendants have sufficiently established that Mr. Hampton's unjust enrichment claim is time-barred.   Mr. Hampton has not carried his burden of establishing an applicable tolling provision.   Mr. Hampton's unjust enrichment claim will be dismissed with prejudice based on the statute of limitations.

### 2.   ADTPA

The same result obtains on Mr. Hampton's ADTPA claim.   The statute of limitations under the ADTPA is five years.[228]   The limitations period begins "on the date of the occurrence of the violation or the date upon which the cause of action arises."[229]   Under the ADTPA, "[a] person who suffers an actual financial loss" because of a violation of the ADTPA can "bring an action to recover" his or her loss caused by the violation.[230]   The plain language of this statute allows a person to sue under the statute when that person suffers a loss.

Relying on the ADTPA, Mr. Hampton first takes aim at Defendants' conduct surrounding the foreclosure sale and their application of bankruptcy payments to Mr. Hampton's loan balance.[231]   Any ADTPA cause of action arising out of this conduct arose, at the latest, in June 2008, when the bankruptcy court released the secured claim and directed Mr. Hampton to resume making direct payments to Wells Fargo.   Mr. Hampton had five years from that time to pursue an ADTPA claim based on the foreclosure and bankruptcy issues.   He did not.

---

[228] Ark. Code Ann. § 4-88-115.

[229] *Id.*

[230] *Id.* § 4-88-13(f).

[231] *See* Compl. (Doc. 2) ¶¶ 81–88.

Mr. Hampton also alleges Defendants violated the ADTPA by "willfully, falsely and inaccurately apply[ing] payments made after Mr. Hampton's bankruptcy to his mortgage accounts creating false principal balances every month as a matter of policy and practice."[232]  Defendants, Mr. Hampton alleges, "deceptively charged Mr. Hampton interest on false unpaid principal balances . . . ."[233]  If this is true, and if Mr. Hampton paid off the principal amount when he says he did (February 2010), any ADTPA cause of action based on this conduct arose, at the latest, when Mr. Hampton started paying these deceptive amounts (suffered a loss) in March 2010.  This means the limitations period ran on this potential claim in March 2015, nearly four years before he filed *Hampton I*.  Defendants have established that Mr. Hampton's ADTPA claim is time-barred.

Mr. Hampton tries to get around his timeliness issues by asserting that his claims "boil down to events occurring during the last three years prior to [the] filing of [*Hampton I*]."[234]  In that time period, Mr. Hampton argues that "Defendants' fraudulently claimed to Plaintiff . . . that he owed them money and was in default and threatened to take his home, and thus got him to pay them money . . . ."[235]  But Mr. Hampton does not allege that Defendants somehow changed tacks between March 2010 (when Mr. Hampton made the first payment after allegedly paying off the loan) and October 2017 (the last month in which Mr. Hampton made a payment).  Mr. Hampton's entire ADTPA theory flows from his allegations that Defendants failed to properly credit Mr. Hampton's payments, which led Defendants to continuously demand monthly payments from Mr. Hampton for a debt he did not owe as of February 2010.  That is the alleged "unconscionable,

---

[232] *Id.* ¶ 87.

[233] *Id.* ¶ 88.

[234] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 1.  The word "fraudulent" appears once in Mr. Hampton's Complaint.  *See* Compl. (Doc. 2) ¶ 29.  Mr. Hampton has not brought a fraud claim in this action.

[235] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 1.

false, or deceptive act or practice . . . ."[236]  That the practice allegedly continues to this day does not make it anything other than a single ADTPA violation with ever-increasing damages.

For the same reasons discussed in the unjust enrichment section, Mr. Hampton has not met his burden of establishing any tolling theory that would save his ADTPA claim from being time-barred.  The Court will dismiss Mr. Hampton's ADTPA claim with prejudice.

### 3.  Trespass

Mr. Hampton alleges that, "[i]n January 2018, Defendants sent their agents into Mr. Hampton's home, as part of the process of aiding [the City] in the demolition of Mr. Hampton's home, without Mr. Hampton's consent, and without any legal right to do so."[237]  This is the factual basis for Mr. Hampton's trespass claim.

Under Arkansas law, the statute of limitations for trespass is three years.[238]  Mr. Hampton filed the Complaint in the case at bar on February 26, 2021.[239]  Mr. Hampton's trespass claim was not in *Hampton I*.  Thus, Mr. Hampton's trespass claim only reaches back to February 26, 2018, three years before the Complaint in the case at bar.  Assuming Defendants entered Mr. Hampton's home on the last day of January 2018, Mr. Hampton's trespass claim accrued over three years before the filing of the instant Complaint.

Perhaps recognizing this, Mr. Hampton argues that his trespass claim is timely based on Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure.[240]  Under that Rule, "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or

---

[236] Ark. Code Ann. § 4-88-107(10).

[237] Compl. (Doc. 2) ¶ 56.  This is a strange allegation considering Mr. Hampton's numerous allegations that Defendants owned the house and that Mr. Hampton was paying taxes and insurance on a house he didn't own.

[238] Ark. Code Ann. § 16-56-105(4).

[239] Compl. (Doc. 2) at 1.

[240] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 4.

defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . ."[241]   Mr. Hampton says that "a comparison of the current Complaint to the Third Amended and proposed Fourth Amended Complaint shows that the claim[] for . . . trespass arise[s] out of the same facts and therefore should relate back."[242]   He means that the trespass claim was not in the third amended complaint in *Hampton I*, but in the unsuccessfully proposed fourth amended complaint.

This argument fails.   Rule 15(c)(1)(b) expressly deals with whether an amended pleading relates back to an original pleading in the same case.[243]   It does not allow a pleading in one case to relate back to a pleading in another case.   The Rule simply does not apply to the present circumstances.[244]

Defendants have sufficiently raised a limitations defense based on the face of the Complaint.   Mr. Hampton has not met his burden of establishing any applicable tolling provision. Mr. Hampton's trespass claim is thus time-barred.   The Court will dismiss this claim with prejudice.

### B.   Res judicata bars Mr. Hampton's negligence and breach-of-fiduciary-duty claims.

For his negligence claim, Mr. Hampton asserts that Defendants owed him a duty of care to provide him fix-or-demolish notices from the City.[245]   For his breach-of-fiduciary-duty claim, Mr.

---

[241] Fed. R. Civ. P. 15(c)(1)(B).   Rule 15(c)(1) of the Arkansas Rules of Civil Procedure mirrors the federal rule.

[242] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 4.

[243] Fed. R. Civ. P. 15(c)(1).

[244] For what it's worth, the Arkansas savings statute would not toll Mr. Hampton's trespass claim.   The Eighth Circuit has explained that the Arkansas savings statute "allows a party to file a new complaint within one year of a nonsuit as long as the cause of action is 'the same in substance as the [original complaint] at the time the latter was nonsuited.'"   *Dillaha v. Yamaha Motor Corp., U.S.A.*, 23 F.3d 1376, 1377 (8th Cir. 1994) (quoting *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 994 (8th Cir.1989)).   Mr. Hampton's trespass claim depends upon elements of proof wholly unlike any claim he brought in *Hampton I*.   Thus, this claim is not the same in substance.

[245] Compl. (Doc. 2) ¶¶ 104–06.

Hampton asserts that (as his agent) Defendants "created a special relationship with Mr. Hampton" to receive fix-or-demolish notices from the City and "therefore had a fiduciary obligation to give him any information received."[246]  The breach of each of these duties, Mr. Hampton says, resulted in the demolition of his house.[247]  Defendants say that Mr. Hampton could have and should have brought these claims in *Hampton I*.  His failure to do so, their argument continues, means that he missed his chance to bring these claims.[248]  Essentially, Defendants argue that res judicata bars Mr. Hampton's negligence and breach-of-fiduciary claims.[249]

Res judicata questions generally require courts to consider pleadings, filings, and orders in prior cases.  Nonetheless, the Eighth Circuit is clear that courts can, in appropriate cases, grant res-judicata dismissals under Rule 12(b)(6).[250]  That's for at least two reasons.  First, courts may look to "public records and materials embraced by the complaint" and "material[s] attached to the complaint."[251]  Second, and additionally, courts "may consider 'some materials that are part of the public record or do not contradict the complaint.'"[252]  Mr. Hampton has not argued that the Court should ignore the existence of *Hampton I*.

---

[246] *Id.* ¶¶ 109–11.

[247] *Id.* ¶¶ 104–06, 109–11.

[248] Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 4) at 11.  Defendants also argue that Mr. Hampton's trespass claim is barred by *res judicata*.  *Id.*  Because the Court has already concluded that this claim is time-barred, it will not address it here.

[249] *Id.*

[250] *See, e.g.*, *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012) (affirming a dismissal under Rule 12(b)(6) on the merits of a res judicata defense).

[251] *Id.* at 763.  In the materials attached to the instant Complaint, there are at least two references to the lawsuit filed in *Hampton I*.  First, in a letter dated January 25, 2018, Mr. Hampton's lawyer threatens Wells Fargo with "the immediate filing of a lawsuit to pursue legal and equitable relief . . . ."  Ex. S to Compl. (Doc. 2) at 90.  Second, in an email dated June 13, 2018, Mr. Hampton's lawyer tells Wells Fargo that she has "advised [her] client that he has the option to seek judicial relief" if the settlement talks fell through.  Ex. U to Compl. (Doc. 2) at 103.  The lawsuit in *Hampton I* followed.  The existence of that first lawsuit is thus necessarily embraced in the materials attached to the complaint in the case at bar.

[252] *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (quoting *Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999)).

The Eighth Circuit has made clear that state law applies to the res judicata question even though *Hampton I* was decided in federal court and the instant case is in federal court.[253]  Here, everyone agrees Arkansas law applies.[254]  Under Arkansas law, res judicata has two facets, "one being claim preclusion and the other issue preclusion."[255]  With respect to the negligence and breach-of-fiduciary-duty claims, Defendants are only arguing claim preclusion.[256]

Claim preclusion "bars not only the relitigation of claims that were actually litigated in the first suit, but also those which could have been litigated."[257]  So "[w]hen a case is based on the same events as the subject matter of a previous lawsuit, claim preclusion will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies."[258]  The Arkansas Supreme Court has set forth the following general test for claim preclusion:

> [t]he claim-preclusion aspect of res judicata bars relitigation of a subsequent suit when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based upon proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies.[259]

For the reasons discussed below, the Court concludes that the doctrine of claim preclusion is fatal to Mr. Hampton's negligence-and-breach-of-fiduciary-duty claims.

First, *Hampton I* resulted in a final judgment on the merits, at least with respect to some claims.  Under Arkansas caselaw, a dismissal with prejudice amounts to a "final judgment" for res

---

[253] *See St. Paul Fire and Marine Ins. Co. v. Compaq Comput. Corp.*, 539 F.3d 809, 822 (8th Cir. 2008) (stating that although a "previous action was rendered in the federal district court," the Eighth Circuit applies state law on the "substantive question of res judicata because state law controls this issue in a diversity action").

[254] *See, e.g.*, Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 4) at 12 ("State preclusion law applies in this diversity action."); Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 10–11 (citing Arkansas state law to oppose Defendants' res-judicata arguments).

[255] *Baptist Health v. Murphy*, 2010 Ark. 358, at 7, 373 S.W.3d 269, 278.

[256] Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 4) at 12.

[257] *Baptist Health*, 2010 Ark. 358, at 7, 373 S.W.3d at 278.

[258] *Id.*, 373 S.W.3d at 278.

[259] *Id.* at 8, 373 S.W.3d at 278.

judicata purposes.[260]   And Mr. Hampton concedes that "some claims were dismissed with prejudice. . . ."[261]   Indeed, he acknowledges that "there would be res judicata as to those specific claims."[262]   That's not surprising.   Judge Wilson dismissed with prejudice Mr. Hampton's claims based on fraud, conversion, AFDCPA violations, and RESPA violations.   With respect to the RESPA violation, Judge Wilson specifically said the dismissal was with prejudice.[263]   And with respect to fraud, conversion, and AFDCPA violations, the Eighth Circuit has made clear that Judge Wilson's dismissal of those claims for failure to state viable claims should be considered "an adjudication on the merits."[264]

Second, the *Hampton I* court properly exercised jurisdiction over the case.   Mr. Hampton does not contest the *Hampton I* court's assertion of diversity jurisdiction over the case.   And this Court's review of the *Hampton I* case suggests the existence of diversity jurisdiction there.   Mr. Hampton's first complaint in *Hampton I* named only Wells Fargo.[265]   Mr. Hampton's amended complaint, filed on October 30, 2019, added Deutsche Bank as a defendant.[266]   Based on diversity jurisdiction, Deutsche Bank removed the case twenty days after Mr. Hampton filed the amended complaint (on November 19, 2019).[267]   The removal was timely because it occurred within thirty

---

[260] *Brown v. Pine Bluff Nursing Home*, 359 Ark. 471, 474, 199 S.W.3d 45, 48 (2004); *see also Curry v. Hanna*, 228 Ark. 280, 283, 307 S.W.2d 77, 80 (1957) ("The rule appears to be well established that a 'dismissal with prejudice' is equivalent to a final judgment insofar as the application of the doctrine of *res judicata* is concerned.").

[261] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 11.

[262] *Id.*

[263] *Hampton I* (Doc. 85) at 1.

[264] *Ahmed v. United States*, 147 F.3d 791, 797–98 (8th Cir. 1998); *see also* Fed. R. Civ. P. 41(b) (stating that "[u]nless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits").   Judge Wilson's Order did not state otherwise.   *See Hampton I* (Doc. 63) at 10 ("The causes of action for conversion, fraud/constructive fraud, punitive damages, and violations of the AFDCPA are DISMISSED.").

[265] *Hampton I* (Doc. 2).

[266] *Id.* (Doc. 4).

[267] *Id.* at 1–2.

days of Deutsche Bank being served with process.[268]  The parties were diverse.  And it was a legal

possibility that the damages sought exceeded $75,000.[269]

      Third, *Hampton I* was fully contested in good faith.  *Hampton I* involved extensive

litigation.  It began in state court on March 5, 2019, and did not reach judgment until January

2021.[270]  Over this nearly two-year span, Mr. Hampton had the opportunity to file four iterations

of his complaint.[271]  Mr. Hampton's complaints (and associated exhibits) grew with each

iteration.[272]  For their part, Defendants had to make and fully litigate two separate dismissal

motions.[273]  Mr. Hampton thoroughly defended against these motions.[274]  And in between the two

dismissal motions, Mr. Hampton was given the chance to fix his complaints to try and avoid

dismissal.[275]  In short, *Hampton I* was fully contested in good faith.[276]

---

[268] *See* 28 U.S.C. § 1446(b)(1) (stating that a "notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based"); *Marano Enters. of Kansas v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001) (holding that "later-served defendants . . . had thirty days from the date of service on them to file a notice of removal with the unanimous consent of their co-defendants, even though the first-served co-defendants did not file a notice of removal within thirty days of service on them").

[269] Mr. Hampton sought specific damages in excess of $45,000.  *Hampton I* (Doc. 1) at 3.  He also sought statutory damages.  *Id.*  He also sought punitive damages.  *Id.*  He also sought attorneys' fees.  *Id.*  At one point, he sent a demand letter to Defendants seeking $225,000.  *Id.*; *see also Applied Energy of AR-LA-MS, Inc.*, No. 5:14-cv-00301-JLH, 2014 WL 1269866, at *1 (E.D. Ark. Oct. 29, 2014) (stating that a settlement demand is probative evidence on the amount-in-controversy question).

[270] *See Hampton I* (Docs. 2, 86).

[271] *Hampton I* (Docs. 2, 4, 37, 65).

[272] *Compare Hampton I* (Doc. 2) (original complaint with nineteen fact paragraphs and 78 pages of exhibits), *with Hampton I* (Doc. 65) (third amended complaint with 60 fact paragraphs and 131 pages of exhibits).

[273] *Hampton I* (Docs. 42, 69).

[274] *Hampton I* (Docs. 49, 50, 73, 74).

[275] *Hampton I* (Doc. 63) (Judge Wilson's October 21, 2021 Dismissal Order allowing Mr. Hampton the opportunity to amend his complaint).

[276] Discovery also ran its course.  Judge Wilson's Final Scheduling Order initially set the discovery deadline as August 19, 2020.  *Hampton I* (Doc. 10).  Mr. Hampton asked Judge Wilson for two extensions of the discovery deadline, and Judge Wilson obliged, ultimately setting October 7, 2020 as the cutoff.  *See Hampton I* (Doc. 18) (Mr. Hampton asking for first extension of the discovery deadline); *Hampton I* (Doc. 35) (Mr. Hampton asking for a second extension of the discovery deadline); *Hampton I* (Doc. 39) (setting October 7, 2020 discovery cutoff date).  During the extended discovery period and just beyond it, Mr. Hampton filed two motions to compel and two motions for sanctions.  *See Hampton I* (Docs. 20, 51, 57, 59).  All to say, *Hampton I* involved extensive discovery (and discovery disputes).  Some of the discovery was even used by Mr. Hampton in his amended complaints.

Fourth, both suits involve the same claims.  In *Hampton I*, Mr. Hampton specifically alleged that Defendants' failures to abide by duties set out by RESPA caused the demolition of his house.  The crux of Mr. Hampton's RESPA argument was that (1) Defendants failed to properly investigate and respond to his RESPA inquiries (e.g., the request for an accounting of monies owed and paid by Mr. Hampton to Defendants) and (2) if they had properly investigated and responded to his RESPA inquiries, "he would have found out about the demolition notices and been able to save his home."[277]  His third amended complaint reads as follows:

> Because Wells Fargo failed to reasonably investigate Mr. Hampton's mortgage file, only Deutsche Bank received the legal notices from the [City] regarding code violations.  These legal notices would have given Mr. Hampton the opportunity to work with the [City] to repair the property or seek extensions as available to homeowners prior to demolition.  These legal notices would have, at the very base level, given Mr. Hampton notice that the property would be demolished so he could remove his personal possessions and family memories before they were destroyed as trash.[278]

In the case at bar, Mr. Hampton alleges that Defendants had either a regular or heightened duty to provide him with the fix-or-demolish notices from the City.  Mr. Hampton says that the breach of those duties caused the demolition of his house.  These new duties are strikingly similar to the RESPA duties in *Hampton I*.  That's a problem for Mr. Hampton.  The Arkansas Supreme Court is clear: "When a case is based on the same events as the subject matter of a previous lawsuit, claim preclusion will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies."[279]  That's exactly what is happening here.  In fact, Mr. Hampton basically concedes this point.  He says that his third amended complaint in *Hampton I* "specifically alleged facts that because of Defendants' actions the house was demolished."[280]  Mr. Hampton also says

---

[277] *Hampton I* (Doc. 65) at 22.

[278] *Id.* at 25.

[279] *Baptist Health*, 2010 Ark. 358, at 8, 373 S.W.3d at 278.

[280] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 4.

his claims for negligence and breach of fiduciary duty "arise out of the same facts" alleged in the third amended complaint.[281]

The only difference between the case at bar and *Hampton I* is Mr. Hampton's reliance on state tort law instead of RESPA.  But dressing up the same factual claim in a new legal jacket doesn't avoid claim preclusion.  As such, for the purposes of res judicata, "both suits involve the same claim or cause of action."[282]

Fifth and finally, both suits involve the same parties.  Mr. Hampton is the Plaintiff in both cases.  And Wells Fargo and Deutsche Bank are the Defendants in both cases.

All factors for res judicata are met here.  And Mr. Hampton's arguments against application of res judicata are not persuasive.  Mr. Hampton points out that he attempted to include his negligence and breach-of-fiduciary-duty claims in a proposed fourth amended complaint in *Hampton I*.[283]  Mr. Hampton argues that Judge Wilson's denial of leave to file the fourth amended complaint means that "[t]here was no ruling that no claim was stated" with respect to negligence and breach of fiduciary duty.[284]  Technically, that's true.  But it also misses the point.  Res judicata bars new legal theories based on the same subject matter litigated in a prior case.  As discussed above, the exact same factual subject matter was litigated fully in *Hampton I*.  That it was litigated under different legal nomenclature is of no moment.

Relatedly, Mr. Hampton argues that "[r]es judicata 'does not bar a subsequent action where ... a party was prohibited from asserting its claim.'"[285]  The Court takes this to mean that Mr.

---

[281] *Id.*

[282] *Baptist Health*, 2010 Ark. 358, at 8, 373 S.W.3d at 278.

[283] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss (Doc. 12) at 11.

[284] *Id.*

[285] *Id.* (quoting *D & T Pure Tr. v. DWB, Inc., LLC*, 2019 Ark. App. 122, at 7, 572 S.W.3d 451, 456).

Hampton believes that Judge Wilson's denial of leave to file the fourth amended complaint prohibited him from bringing his negligence and breach-of-fiduciary-duty claims.  This argument is unavailing.  Recall that Mr. Hampton filed four different complaints in *Hampton I*.  Judge Wilson freely granted Mr. Hampton leave to file two of those complaints.  Before filing his third amended complaint, Mr. Hampton knew (or had at least sufficiently alleged) that (1) property records showed Deutsche Bank as owning the house, (2) Deutsche Bank had received multiple notices from the City regarding the condition of the house and the potential for demolition, (3) neither Defendant ever forwarded any notices to Mr. Hampton, and (4) that the house was demolished (nearly a year before filing *Hampton I*).  Nothing prevented Mr. Hampton from bringing his negligence or breach-of-fiduciary claims in the third amended complaint.[286]

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED in its entirety. The Court will DISMISS all claims against Defendants *with prejudice*.

IT IS SO ORDERED this 15th day of March 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[286] Mr. Hampton's other arguments against the application of res judicata to these claims are similarly unpersuasive.